IN THE UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| CRYPTON FUTURE MEDIA, INC., <br><br> PLAINTIFF, <br><br> V. <br><br> THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, <br><br> DEFENDANTS. | CASE NO.: 1:20-CV-05589 <br><br> JUDGE MARY M. ROWLAND <br><br> MAGISTRATE JUDGE JEFFREY CUMMINGS <br><br> **FILED UNDER SEAL** |

### DECLARATION OF PAUL VARLEY

I, Paul Varley, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am a consultant for Crypton Future Media, Inc. ("Crypton"), which is based in Japan. I am knowledgeable about or have access to business records concerning all aspects of the brand protection operation of Crypton Future Media, Inc. including, but not limited to, its trademarks, other intellectual property, sales, on-line sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Founded in 1995, Plaintiff, Crypton Future Media, Inc., acts as the creator, marketing branch, and distributor of all authorized products utilizing the Hatsune Miku Trademarks (referred to as "Hatsune Miku Products") internationally. Plaintiff is a Japanese media

4

company based in Sapporo, Japan. It develops, imports, and sells products for music, such as sound generator software, sampling CDs and DVDs, and sound effect and background music libraries.

4. Plaintiff developed a voice synthesizer animated as an anthropomorph, a teenage girl with long, turquoise twintails, named Hatsune Miku, that has been featured in over 100,000 songs released worldwide with over 1,000,000 created artworks. Miku's personification has been marketed as a virtual idol and has performed at concerts onstage as an animated projection. Miku has been heavily promoted since 2008. On September 12, 2007, Amazon.co.jp reported sales of Hatsune Miku totaling 57,500,000 yen, making her the number one selling software of that time.

5. The Hatsune Miku Products and other similar Crypton brand products have found incredible success and appreciation worldwide.

6. Crypton is the official licensor of all Hatsune Miku Products and provides its Intellectual Property assets to its authorized licensees for the development, production, distribution, and sale of authorized licensed products.

7. Crypton Future Media, Inc. is the owner of the U.S. Trademark Registration Nos. 4,163,035; 4,887,255; 4,891,005; and 4,879,127 (collectively, the "Hatsune Miku Trademarks" or "Crypton Intellectual Property (IP)").

8. The above registrations for Hatsune Miku are valid, subsisting, and in full force and effect. True and correct copies of the federal trademark registration certificates for the Hatsune Miku Trademarks are attached hereto as **Exhibit 1**.

9. The Hatsune Miku Trademarks have been continuously used and never abandoned.

10. The Hatsune Miku Trademarks are distinctive and identifies merchandise as goods from Crypton.

11. Crypton has expended time, money, and other resources in developing, advertising, and otherwise promoting the Hatsune Miku Trademarks. As a result, products bearing the Hatsune Miku Trademarks are recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Crypton. Crypton has ensured that products bearing its IP are manufactured to the highest quality standards. As such, the recognition and goodwill associated with the brand is of incalculable and inestimable value to Crypton.

12. The success of the Hatsune Miku brand has resulted in its significant counterfeiting. Consequently, Crypton is implementing an anti-counterfeiting program by investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Crypton Future Media, Inc. has identified numerous domain names linked to fully interactive websites and marketplace listings on various platforms, including the online marketplace accounts identified in Schedule "A" attached to the Complaint (collectively, the "Defendant Internet Stores" or "Seller Aliases"), which are offering for sale, selling, and importing unauthorized and counterfeit products in connection with the Hatsune Miku Trademarks (referred to as "Counterfeit Hatsune Miku Products" or the "Counterfeit Products") to consumers in this Judicial District and throughout the United States. Despite Crypton's enforcement efforts online, Defendants have persisted in creating the Defendant Internet Stores.

13. I perform, supervise, and/or direct investigations related to Internet-based infringement of the Hatsune Miku Trademarks. Our investigation shows that Defendants are using the Defendant Internet Stores to sell Counterfeit Hatsune Miku Products from foreign countries such as China to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the Defendant Internet Stores and determined that Counterfeit Hatsune Miku Products were being offered for sale to the United States, including Illinois. This conclusion was

reached through visual inspection of the products listed for sale, the price at which the Counterfeit Hatsune Miku Products were offered for sale, other features commonly associated with websites selling counterfeit products, because Defendants offered shipping to the United States, including Illinois, and because Defendants and their websites do not conduct business with Crypton and do not have the right or authority to use the Hatsune Miku Trademarks for any reason. True and correct copies of screenshot printouts showing the active Defendant Internet Stores reviewed are attached as **Exhibit 2**.

14. Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers selling genuine Hatsune Miku Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union, Amazon and PayPal, among others. The Defendant Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Crypton has not licensed or authorized Defendants to use its Hatsune Miku Trademarks, and none of the Defendants are authorized retailers of genuine Hatsune Miku Products.

15. Upon information and belief, Defendants also deceive unknowing consumers by using the Crypton IP without authorization within the content, text, and/or meta tags of their websites, in order to attract and manipulate search engines into identifying the Defendants Internet Stores as legitimate websites for Hatsune Miku Products. Defendants also employ other

unauthorized search engine optimization ("SEO") tactics and social media spamming so that Defendant Internet Stores show up at or near the top of relevant search results, including tactics to propel new domain names to the top of search results after others are shut down. These tactics are meant to, and are successful in, misdirecting consumers who are searching for genuine Hatsune Miku Products.

16. Defendants often go to great lengths to conceal their identities by using multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. Other Defendants often use privacy services that conceal the owners' identity and contact information. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule "A" to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

17. There are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Counterfeit Hatsune Miku Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Hatsune Miku Products were manufactured by and come from a common source; and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics,

HTML user- defined variables, domain redirection, lack of contact information, identically or similarly priced similar hosting services, similar name servers, and the use of the same text and images.

18. Defendants in this case, and defendants in other similar cases against online counterfeiters, use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

19. Counterfeiters such as Defendants typically operate multiple credit card merchant accounts as well as Amazon, Alipay, WISH, and/or PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Crypton's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal, or similar accounts, to off-shore bank accounts outside the jurisdiction of this Court.

20. Monetary damages alone cannot adequately compensate Crypton Future Media, Inc. for ongoing infringement because monetary damages fail to address the loss of control of and damage to Crypton's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to Crypton's reputation and goodwill by acts of infringement.

21. Crypton's goodwill and reputation are irreparably damaged when the Hatsune

Miku Trademarks are used on goods not authorized, produced, or manufactured by Crypton. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Crypton's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

22. Crypton is further irreparably harmed by the unauthorized use of the Hatsune Miku Trademarks because counterfeiters take away Crypton's ability to control the nature and quality of products bearing the Hatsune Miku Trademarks. Loss of quality control over goods bearing the Hatsune Miku Trademarks and, in turn, loss of control over our reputation is neither calculable nor precisely compensable.

23. The sale of Counterfeit Hatsune Miku Products bearing the Hatsune Miku Trademarks also causes consumer confusion, which weakens Crypton brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit Hatsune Miku Products they have purchased originated from Crypton will come to believe that Crypton offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine Hatsune Miku Products, resulting in a loss or undermining of Crypton's reputation and goodwill.

24. Crypton is further irreparably damaged due to a loss in exclusivity. Genuine Hatsune Miku Products are meant to be exclusive. Crypton's marketing and distribution of Hatsune Miku Products are aimed at growing and sustaining sales of Hatsune Miku Products. The Hatsune Miku Trademarks are distinctive and signify to consumers that the products originate from Crypton, and are manufactured to Crypton's quality standards. When counterfeiters use the Hatsune Miku Trademarks on goods without Crypton's authorization, the exclusivity of Hatsune Miku Products, as well as Crypton's reputation, are damaged and eroded, resulting in a loss of

unquantifiable future sales.

25. Crypton will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2020.

*/s/ Paul Varley*
Paul Varley